United States of America
District of Massachusetts

Suffolk, ss.

_____
             )
In Re: Grand Jury Subpoena   )   Docket No._____
             )
_____

## Motion to Quash
## Grand Jury Subpoena

  Now comes the Movant, Dean Tran, who moves to quash grand jury subpoenas issued to Alecon Enterprises and to Mr. and Mrs. Martin.

  **Background**

  Dean Tran is a former Massachusetts State Senator who ran, unsuccessfully, for Congress in 2022. He is currently facing unrelated state criminal charges in the Worcester Superior Court.[1]

  On June 22, 2023 federal agents executed a search warrant at Mr. Tran's house.[2] *In Re: Search of 44 Tibbet Circle*, case. No. 23-mj-1187-DLC. Attachments to the warrant indicated that the federal government was investigating potential wire fraud, wire fraud conspiracy, and false tax returns. The warrant authorized the search of a large collection of documents and, more or less, any electronic device present on the premises. In sum, it appears that the government is investigating three general headers: (1) Mr. Tran's tax status for some months as a contractor before obtaining full-employment with Mr. Rick Green's A1A Auto[3], (2) the reporting of income from certain rental properties, and (3) Mr. Tran's receipt of unemployment assistance, including some enhanced benefits during COVID, following his election loss.

---

[1] Mr. Tran brought a civil suit in this court asking to enjoin the State criminal action as violative of his federal constitutional rights. The Court deferred finding, in part, that there was no indication that Mr. Tran's rights could not be fairly adjudicated in the state courts.
[2] The issuance of the search warrant,
[3] Mr. Green is a friend of Mr. Tran but is better known as a significant donor and, formerly, Finance Chair for the Massachusetts Republican Party.

1

**Additional Factual Assertions**

The Federal Government has brought some aspects of its investigation into Mr. Tran to a grand jury.[4]

Mrs. Martin is Mr. Tran's sister. Following Mr. Tran's election loss and, his unemployment, his sister made an offer of employment at a $120,000 annual salary. Despite the generous offer, Mr. Tran was unable to accept employment because Mrs. Martin's company is in New Hampshire. At the time, due to COVID, Mr. Tran's children's school was closed and resultingly he could not travel to New Hampshire. The offer letter from Mr. Tran's sister was submitted to the Massachusetts unemployment office and used in assessing Mr. Tran's eligibility for unemployment benefits and his potential salary if employed, which factors into the amount of benefits Mr. Tran might receive.

The federal government evidently believes that this offer of employment was not genuine and, resultingly, it and the Commonwealth were mislead about the amount of benefits Mr. Tran was eligible to receive.

The federal government summoned Mrs. Martin to appear before the grand jury. The government threatened Mrs. Martin, apparently very aggressively to try an secure the testimony they want. It is understood that they also offered Mrs. Martin immunity, but were still unable to coerce Mrs. Martin into changing her testimony. It is reported that on the date of her appearance before the grand jury, Mrs. Martin was corralled into a room with federal officials and again coerce and harangued. After suffering substantial verbal abuse for almost two hours, Mrs. Martin insisted on her right to testify before the grand jury, in accordance with the summons, or be released from the grasp of federal officials.

---

[4] Grand Jury proceedings are, of course, normally secret under Fed. R. Crim. Pro. Rule 6.

2

It is understood that Mrs. Martin testified that the offer of employment was genuine. Following her testimony, new grand jury summons issued requesting a broad array of materials. These summons are, Mr. Tran contends, retaliatory and part of a continuing abuse of the grand jury by the federal government.

The new grand jury document summons, the ones protested here, came with a cover letter from the U.S. Attorney's Office. The cover letter reads, in part:

> You are hereby requested <u>not</u> to disclose the existence of this subpoena, or the fact of your compliance therewith, to anyone. While you are not required to comply with this request, any such disclosure could impede the investigation and thereby interfere with the enforcement of federal criminal law.

*Cover Letter from AUSA dated July 28, 2023.*

Subsequently, Mr. Tran's two other siblings were both summoned into the Massachusetts Registry of Motor Vehicles, sent the same day. They received notices that the Mass. RMV intended to suspend or revoke their driver's licenses based on unspecified information that the licenses were obtained fraudulently. These allegations are patently untrue. One of Mr. Tran's brother's brought all his documentation to the Mass. RMV, and was initially informed that he was all set until the window clerk conferred with a supervisor. The RMV supervisor reversed the initial determination, insisting on a hearing. Both siblings, despite respected careers and being dedicated civic-minded individuals, are due to be questioned by an RMV hearing officer as criminals suspected of wrongdoing. This is, Mr. Tran asserts, nothing more than an organized pressure campaign against him, which crosses the line into prosecutorial misconduct.

## Argument

**I.     The Grand Jury Subpoenas are the product of a pattern of prosecutorial misconduct**

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88 (1935).

> Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts."

Brady v. Maryland, 373 U.S. 83, 87 (1963). Federal courts are normally reluctant to interfere with a grand jury process. United States v. Dionisio, 410 U.S. 1 (1973). Nonetheless, there is an important supervision obligation vested in the judiciary. Branzburg v. Hayes, 408 U.S. 665, 688 (1972) ("the powers of the grand jury are not unlimited and are subject to the supervision of a judge."); Dionisio, 410 U.S. at 11 ("This is not to say that a grand jury subpoena is some talisman that dissolves all constitutional protections").

    a.    **The Prosecutor has inappropriately, and in writing, threated criminal prosecution for lawful use of legal rights**

As the First Circuit has notably said, a grand jury witness "in any event, has the right to broadcast the substance of his testimony if he so desired…the witness can stand on the courthouse steps and tell the public everything the witness was asked and answered." In re: Grand Jury, 566

F.3d 12, 17 (1st Cir. 2009) (citation and quotation marks omitted).  In the cover letter for the subpoenas to Mrs. Martin, and her husband and her company the prosecutor crossed the line.

Although the cover letter (attached) recognizes the right of Mrs. Martin to disclose the subpoena, it then goes on to state "While you are not required to comply with this request, any such disclosure could impede the investigation and thereby interfere with the enforcement of federal criminal law." *Grand Jury Subpoena Cover Letter*.  This letter, ostensibly acknowledging Mrs. Martin's right to sing this material from the courthouse steps, it then proceeds to threat criminal prosecution the lawful use of this right.

| *Cover Letter* | *Statute* |
|---|---|
| While you are <u>not</u> required to comply with this request, any such disclosure could **impede the investigation** and thereby **interfere** with the **enforcement of federal criminal law** | 18 U.S.C. §1519<br>Whoever…[alters, conceals, etc. a document] with the intent to impede, obstruct, or influence the investigation or property administration [of any governmental matter] |
| | 18 U.S.C. §1503<br>Whoever…corruptly…obstructs or impedes…the due administration of justice. |

A comparison of the language chosen by the federal prosecutor, the officer authorized to bring charges, and a pair of obstruction of justice statutes show that the federal prosecutor is expressly connecting the use of the of a legal right (to shout one's dealings with the grand jury from the courthouse steps) with obstruction of justice.  Giving with one hand and taking away with the other, in the same sentence, necessarily undermine the safety and confidence with which a grand jury witness can exercise their legal rights.  This is categorically improper.

These threats also discourage a witness, such as Mrs. Martin, from exercising their right to seek to quash or limit the improper reach of a grand jury subpoena.  The threat, if believed by a witness, would leave the government unsupervised in its control of the grand jury.  In such case a

prosecutor would be able to commit abuses of process in the dark against helpless witnesses who believe they cannot even seek the protection of the courts.

b.     **The prosecutor has threatened witnesses, namely Mrs. Martin**

"[T]he prosecutor's right to exercise some discretion and selectivity in the presentation of evidence to a grand jury does not entitle him to mislead it or to engage in fundamentally unfair tactics before it." United States v. Ciambrone, 601 F.2d 616, 623 (2d. Cir. 1979).  Even after Mrs. Martin spurned the offer of immunity, because her testimony is true even if it is not what the prosecutors wish to hear, the prosecutors continued to harangue, harass, and verbally assault Mrs. Martin.

c.     **The federal authorities leaked the search warrant to the Boston Globe**

The FBI, on June 22nd, were in place to execute their search warrant before 6AM.  Within 6 hours, a reporter from the Boston Globe called Mr. Tran's state court defense counsel seeking comment on the raid.  This leak could only have come from federal sources.  The U.S. Attorney's office in this jurisdiction has a sorted history with leaks to the press, on several occasions flirting with violations of the grand jury secrecy provisions of Fed. R. Crim. Pro. Rule 6.  A leak of this nature is particularly damaging to a public figure, like Mr. Tran, who is a prominent republican party official.  Extensive adverse pretrial publicity can taint the proceedings of a grand jury, although substantiating evidence is required.  Beck v. Washington, 369 U.S. 541, 545-546 (1962) (discussing the furnishing of an unbiased grand jury in light of extensive pretrial publicity); United States v. Mandel, 415 F. Supp. 1033, 1064-65 (D. Md. 1976) (extensive consideration of various types of prosecutorial misconduct before the grand jury including pre-indictment publicity that government knew of, participated in and welcomed); United States v. Sweig, 316 F.Supp. 1148, 1153 (S.D.N.Y. 1970) (noting the unmanageable burden of assault an indictment on pretrial

publicity grounds but acknowledging that government-generated publicity has a different analysis); Silverthorne v. US, 400 F.2d 627 (9th Cir. 1968) (holding that grand jurors should be questioned about extensive pretrial news reports).  "We do not approve of pretrial publicity, particularly when it emanates from prosecuting officials." Gorin v. US, 313 F.2d 641, 645 (1st Cir. 1963).

d. **It is not clear that the search warrant presented was, in fact, valid, as no such docket number appears in the federal court's database.**

Though the FBI presented what appears, on its face, to be a valid search warrant, Mr. Tran has been unable to confirm this.  This is because in the public database for this District, no such case appears.  It is not as if the case is sealed—the electronic system reports that result in a particular manner.  It is as if the case does not exist. *See Attachment* (printouts showing no docketing of a case under the number indicated on the putative warrant).

If government agents presented a false search warrant and seized devices, obtained electronic information of all stripe from Mr. Tran, his wife and family, without authority this is the kind of grave misconduct which scream for the use of supervisory power by the federal court.

Given the plethora of non-governmental criminals who have taken to using search warrants to obtain access to places and steal things, the ability of average citizen to confirm that the search warrant is real, or at least that the docket number is a real proceeding with the Court is significant.

e. **The Subpoenas are unreasonable and oppressive**

In United States v. R. Enterprises, 498 U.S. 292 (1991) the Court clarified the standards governing grand jury subpoenas are different than other kinds of subpoenas.  Nonetheless, they are still subject to being quashed if they are unreasonable or oppressive.  Here the grand jury subpoena is baldy overbroad and unrelated to the investigation at issue, Mr. Tran's receipt of

7

unemployment benefits during the pandemic. While this argument is repeated below, in relation to the retaliatory nature of the prosecutor's actions, it is also important to note that the Court should not sustain the subpoenas on their own face.

The subpoenas ask for the federal and state tax returns of Mrs. Martin's business and her own personal ones. It then proceeds to demand, in substance, all financial records as well as any underlying material: books, ledgers, cancelled checks, banks statements, deposit slips, all documents which could in any way conceivably relate to Mrs. Martin's financial affairs. Considering this is a Massachusetts grand jury, demanding materials from a New Hampshire woman and a New Hampshire company all their financial documents, the Court must view this suspiciously. Certainly, Mrs. Martin is entitled to have the government make the preliminary proffer under United States v. R. Enterprises, 498 U.S. 292 (1991) to show that this subpoena relates to anything at all.

The subpoenas, aside from turning Mrs. Martin's life upside for no reason other than her nerve to testify in the face of governmental hostility, are also technically deficient and call for the production of at least some privileged materials. The subpoenas, neither of them, for example, "state…the title of the proceeding." Fed. R. Crim. Pro. Rule 17(a). The overbreadth of the demanded materials, catching up privilege materials in the dragnet, is shockingly similar to the way in which the search warrant aimed at Mr. Tran scooped up privileged materials involving his communications with his state court criminal defense counsel. It is also possible to infer, from the face of them, that the subpoenas are not issued in good faith: the government is already the recipient and repository of the federal tax returns, thus that request is duplicative of materials the government already possesses. Its inclusion, in addition to all the underlying material supporting the return and all financial documents of any kind, suggests that the government is not investigating

Mrs. Martin for tax issues although, for termerity to oppose the government something of that nature will undoubtedly be ginned up to intimidate Mrs. Martin.  If the Government wanted to prove some tax issues with Mrs. Martin, or her business, they are not only in the wrong district, but they would be far more interested in the underlying documents than the tax returns.  This is nothing more than a burdensome fishing expedition, imposed upon a poor innocent woman for the nerve and temerity of her to tell the grand jury a truth which the Government disapproves of and could not coerce her out of.

    f.    **The Subpoenas are retaliatory and coercive**

The subpoenas are issued by the prosecutor and solely to intimidate Mrs. Martin.  There is no suggestion or indication of any kind that the government was previously investigating Mrs. Martin, nor could there be because her operations are in a different state and a different judicial district.  Mrs. Martin's connection to Massachusetts is the exculpatory testimony she gave in favor of Mr. Tran to the grand jury.

Therefore there is no good faith basis to issue the subpoena.  Most of the materials demanded have nothing to do with the investigation into Mr. Tran.  They are simply designed to represent a forceful show of authority against a witness who won't cooperate with the government's preferred factual situation.  A similar abuse of governmental authority was railed against by James Otis in 1761 against the Writs of Assistance.

> This wanton exercise of power is not a chimerical suggestion of a heated brain.  I will mention some facts.  Mr. Pew had one of these writs, and when Mr. Ware succeeded him, he endorsed the writ over to Mr. Ware: so  that, theses writs are negotiatble from one officer to another; and so your Honours have not opportunity of judging the person to whom this vast power is delegated. Another instance is this: Mr. Justice Walley had called this same Mr. Ware before him, by a constable, to answer for a breach of the sabbath-day acts, or that of profane swearing.  As soon as he had finished, Mr. Ware asked him if he had done. He replied, Yes.  Well then, said Mr. Ware,

> I will shew you a little of my power.  I command you to permit me
> to search your house for uncustomed goodds; and went on to search
> the house from the garrett to the cellar; and then served the constable
> in the same manner.!

Paxton's Case, as reported in *Tudor's Life of Otis*, at 67 (1823).  Now the Government, 300 years later still reflexively resorts to the same kind of bald abuses of power.  Failing to coerce Mrs. Martin to testify as they prefer, she is summoned to the grand jury.  Being harangued in a private interview she insists on her right to testify before the grand jury according to the subpoena or be released.  Having so testified, to the displease of the government, the prosecutor says "are you done? Let me show you my power." Now Mrs. Matin's life, family, and marriage are to be examined and torn apart, not on any good-faith basis but simply because the government didn't like her testimony.

**g.     The conduct of the prosecutor in harassing, threatening, and abusing the witness is coercion.**

If a witness were to change their mind, or their testimony, because they were coerced by a prosecutor, there can be no doubt that this would be misconduct.  Ciambrone, 601 F.2d at 623 (prosecutor forbidden to obtain indictment based on false evidence); Bank of Nova Scotia v. United States, 487 U.S. 250, 259 (1988) (courts empowered to address prosecutorial misconduct before a grand jury which "raise as substantial and serious question about the fundamental fairness of the process" or if the misconduct has "substantially influenced the grand jury" or has caused "grave doubt as to whether the decision to indict was so influenced").  Although misconduct can come in various stripes, fundamentally the prosecutor must be fair. United States v. Hogan, 712 F.2d 757 (2nd Cir. 1983) (dismissal of indictment required because prosecutor impaired independence of grand jury by prejudicing it, eliciting false evidence and calling defendant "a real hoodlum who

10

should be indicted as a matter of equity" and speculating about his connection to other unmentioned crimes); United States v. Asdrubal-Herrara, 470 F. Supp. 939 (N.D. Ill. 1979) ("negligent" conduct of prosecutor had "polluted the waters of justice" by causing suspicion defendant had engaged in other crimes).

It must be true that if the government cannot use false testimony, or knowingly allow false testimony to go uncorrected, then there must also be a constitutional prohibition on manufacturing false testimony by harassing witnesses against Mr. Tran. Napue v. Illinois, 360 U.S. 264, 269 (1959) ("it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment…The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.").

Because Mr. Tran may be affected negatively by this harassment of a witness, who has given the grand jury favorable testimony to him, the Court must view the Government's post-testimony subpoenas with a jaundiced eye. It stinks that, after the government had failed to coerce, cajole, harass, and otherwise compel Mrs. Martin to give false testimony against Mr. Tran, they now seek to make her the subject of investigation. The grand jury cannot function independently if those who go before and do not testify as the prosecutor wishes sudden become subject to grievous consequences, investigation, harassment, and in not ably represented criminal conviction and jail time. To allow such a matter to stand would tell the entire world that testimony before the grand jury must be what the government wishes, or else.

Nor has the government been particularly subtle in its efforts. The subpoena now expand to include Mrs. Martin's husband and her business, her livelihood and her family are now in jeopardy because she went into the grand jury room and testified, truthfully as she knows it, in a

manner that has displeased the prosecutor. This is the very definition of the harassment and intimidation of a grand jury witness. Were anyone else intimidating a witness in this fashion, even through the use of legal process, the federal government would call it a crime. The fact that the bad actor here wears a cloak of governmental authority should not protect him.

**h. Mr. Tran has standing to raise these issues, for it he does not he will not be able to later.**

It is normally true that someone may not assert rights on behalf of a third party. There are a handful of well-known exceptions.

However in this case there is no doubt that the Government is attacking one of Mr. Tran's witnesses. A witness who, bravely, delivered exculpatory testimony to the grand jury on Mr. Tran's behalf. This witness is being hounded, investigated, her world is being turned upside and now her family and her livelihood are being torn apart because the governed was displeased with the exculpatory testimony. The Government's failure to bend, coerce, alter, or tamper with Mrs. Martin's testimony before she ultimately insisted, on her own steam to testify pursuant to her summons, should end the matter. Harassing Mr. Tran's witness after she has definitively delivered exculpatory testimony is prosecutorial bad faith. *See* Webb v. Texas, 409 U.S. 95, 96 (1972) (duress and coercion upon chief defense witness, with threats of perjury prosecution, unconstitutionally deprived defendant of his right to present a defense). Its consequences, no matter what happens to Mrs. Martin, redound against Mr. Tran. Starting right up there with the strong likelihood that other people will be unwilling or unable to truthfully exonerate Mr. Tran if their testimony, when the prosecutor dislikes it, brings the wrath of prosecution upon the other witnesses to be.

Moreover, if Mr. Tran does not assert his rights to a grand jury free of irregularities and coercion now the case law forbids him from doing so later. United States v. Mechanik, 475 U.S.

66 (1975) (holding that even "diligent" discovery of prosecutorial misconduct after conviction does not allow for the issue to be raised, for a petit jury's conviction waives aside all irregularities before the grand jury).  It is Mr. Tran's defense which is compromised by the government placing duress and coercion upon his witness, who has given exculpatory testimony.  *See* Webb, 409 U.S. at 96-97; United States v. Linder, docket No. 12 CR 22-1 (N.D. Ill. 8/9/2012) ("Threats or intimidation made by the government that dissuade a potential defense witness from testifying is a violation of the defendant's right to due process of law and his Sixth Amendment right to compulsory process for obtaining defense witnesses."); United States v. Pinto, 850 F.2d 927, 932 (2nd Cir. 1988) ("Under certain circumstances, intimidation or threats that dissuade a potential defense witness from testifying may infringe a defendant's due process rights.");  id., ("That interference may involve threats of prosecution…or other intimidating conduct."). United States v. Macloskey, 682 F.2d 468, 479 (4th Cir. 1982) (reversing conviction where prosecutor made 11th hour call to critical defense witness's attorney to make "suggestion" that she not testify; not subject to harmless error analysis); United States v. Smith, 478 F.2d 976, 979 (D.C. Cir. 1973) (prosecutor "advising" primary defense witness of 5th amendment rights, even if from impeccable motives, critically implied criminal prosecution for testifying for defendant, conviction reversed) *citing* People v. Pena, 383 Mich. 402, 406 (1970) ("[a] prosecutor may impeach a witness in court by he may not intimidate him—in or out of court."); Bray v. Peyton, 429 F.2d 500 (4th Cir. 1970) (prosecutor's imprisoning of defense witness on unrelated old but facially valid charges violated the constitution).

> The State habeas judge stated that the arrest of the defense witness during trial "could have had an intimidating effect, not only upon that witness, but upon the other witnesses who were called for the defendant * * *." It is difficult to imagine the contrary… Thus, there exists the strong probability that jailing one of Bray's witnesses robbed him of his only defense. At the least, it was quite relevant

> since in Virginia the jury fixes the punishment…Even if not deliberate, the prosecuting official obviously obstructed the defendant's offer of exculpating proof. A blow to our adversary trial system, it was inherently prejudicial.

Bray, at 501.  "It is well-settled that substantial government interference with a defense witness's free and unhampered choice to testify violates the defendant's due process rights." Newell v. Hanks, 283 F.3d 827, 837 (7th Cir. 2002).  This Mr. Tran's rights are violated by the intimidation of *his* exculpatory witness and this gives him standing to challenge the subpoenas to Mrs. Martin, her husband and her business.  Cf. United States v. Vavages, 151 F.3d 1185, 1191 (9th Cir.1998) (prosecutor threatened to withdraw witness's plea agreement in her own unrelated criminal prosecution if she testified in support of defendant's alibi); United States v. Morrison, 535 F.2d 223, 225-28 (3d Cir.1976) (prosecutor repeatedly warned and intimidated prospective defense witness about possibility of perjury charges if she testified falsely)

Governmental interference in Mr. Tran's defense need not even come directly from the prosecutor.  United States v. Little, 753 F.2d 1420, 1438-1439 (9th Cir. 1984) (IRS Agents intimidating defense witnesses depriving defendant of his right to present a defense).  **It is beyond question that a grand jury subpoena can be unconstitutional intimidation of defense witnesses.** United States v. Hammond, 598 F.2d 1008, 1012-1013 (5th Cir. 1979); United States v. Wadlington, 233 F.3d 1067, 1075-1076 (8th Cir. 2000) (prosecutor improperly used grand jury subpoenas to get private interviews with and harangue defense witnesses); Webb v. Texas, 409 U.S. 96, 96 (1972) (court violated defendant's rights by driving defense witness off the stand with strident warnings including a personal promise to subject witness before the grand jury).  Witness intimidation by the government is a serious business which automatically reverses a conviction without any proof of prejudice.  United States v. Goodwin, 625 F.2d 693, 702-703 (1980) ("Threats against witnesses are intolerable. Substantial government interference with a defense witness' free

and unhampered choice to testify violates due process rights of the defendant…If such a due process violation occurs, the court must reverse without regard to prejudice to the defendants..").  This right is so precious, to present a defense with witnesses unhampered, that at least one circuit has endorsed a remedy for government violation in the form of granting immunity to the defense witness for whatever crime the government is investigating or threatening the defense witness with.  US v. Roach, 502 F.3d 425, 438 (6th Cir. 2007) ("One possible remedy for such discouragement would be for the court to grant immunity from prosecution to the witness for the alleged crime uncovered by the prosecutorial actions.").  Heavy handed prosecution actions, even after a witness has testified to the grand jury, are bread and butter Webb claims.  US v. Morris, 988 F.2d 1335 (4th Cir. 1993) (wife-secretary took marital privilege before grand jury, and when she later changed her mind and testified at trial, it was unconstitutional error to allow prosecution to point out her invocation of testimonial privilege before grand jury).

Since Mr. Tran is asserting his own rights and protecting his own witness, he has standing to challenge the subpoenas aimed at Mrs. Martin, her husband, and company.

**Conclusion**

Wherefore Mr. Tran asks for a hearing and ultimately, the quashing or narrowing of the subpoenas directed to Mrs. Martin and Alecon Enterprises.

    Respectfully Submitted,

    Dean Tran,
    By his Attorney
    /S/ Michael Walsh
    Michael Walsh
    Walsh & Walsh LLP
    PO Box 9
    Lynnfield, MA 01940
    617-257-5496
    Walsh.lynnfield@gmail.com

**Certificate of Service**

I, Michael Walsh, hereby certify that a copy of this motion and appendix were served upon AUSA Dustin Chao and Atty Goldberg on this 28th day of September, 2023 by email and by first class mail.

/S/ Michael Walsh